V.R. DeANGELIS M.D., P.C., R.T. Domingo M.D., P.C., V.R. DeAngelis M.D., P.C., Tax Matters Partner, Vincent DeAngelis, Jeanette DeAngelis, Rodolfo Domingo, Bernadette Domingo, Keith Durante, Kathleen Durante, Anthony J. Capizzi, Mary Ann Capizzi, Petitioners–Appellants–Cross–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee–Cross–Appellant.

Docket Nos. 08–1143–ag (L), 08–3357–ag (XAP), 08–3360–ag (XAP), 08–3361–ag (XAP), 08–3367–ag (XAP), 08–3376–ag (XAP).

United States Court of Appeals, Second Circuit.

Argued: May 29, 2009.

Decided: July 21, 2009.

Ira B. Stechel, Wormser, Kiely, Galef & Jacobs LLP, New York, N.Y. (John T. Morin and Jennifer L. Marlborough, on the brief) for Petitioners–Appellants–Cross–Appellees.

Randolph L. Hutter, Attorney, for John DiCicco, Acting Assistant Attorney General, Tax Division, Department of Justice, Washington, DC (Kenneth L. Greene, Attorney, on the brief) for Respondent–Appellee–Cross–Appellant.

Before: LEVAL, POOLER, and PARKER, Circuit Judges.

PER CURIAM:

We affirm the orders of the Tax Court for the reasons stated in its decision. *See V.R. DeAngelis M.D.P.C. v. Comm'r of Internal Revenue,* 94 T.C.M. (CCH) 526 (2007), a copy of which is annexed to this opinion as an appendix. We have considered petitioners' arguments for a contrary result and found them to lack merit.

# APPENDIX

Westlaw.

T.C. Memo. 2007-360                                                                          Page 1
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

C

United States Tax Court.

V.R. DEANGELIS M.D.P.C. & R.T. Domingo M.D.P.C., V.R. Deangelis M.D.P.C., Tax Matters Partner, et al.,[FN1]
Petitioners

FN1. Cases of the following petitioners are consolidated herewith: Vincent and Jeanette DeAngelis (collectively, DeAngelises), docket No. 10635-05;Rodolfo and Bernadette Domingo (collectively, Domingos), docket No. 10636-05;Keith and Kathleen Durante (collectively, Durantes), docket No. 10637-05, and Anthony J. and Mary Ann Capizzi(collectively, Capizzis), docket No. 10638-05.While the parties sometimes refer to the name "DeAngelis" as "De Angelis", we consistently refer to that name as "DeAngelis". We also note that the first word in the name of each relevant professional corporation is a complete word but that the parties sometimes refer to the word by its initial letter. With the exception of the caption and of the partnership, V.R. DeAngelis M.D.P.C. & R.T. Domingo M.D.P.C., whose name is actually spelled using only the initial letter of the first word of each professional corporation referenced therein, we refer to each professional corporation by using its full first word.

v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Nos. 10634-05, 10637-05, 10635-05, 10638-05, 10636-06.

Dec. 5, 2007.

John T. Morin and Ira B. Stechel, for petitioners.

Peter James Gavagan, Peggy J. Gartenbaum, and Thomas A. Dombrowski, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                    Page 2
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

*1 These cases are consolidated for purposes of trial, briefing, and opinion. Each couple consists of a medical doctor and his wife, and each doctor is the sole owner of an S corporation that was a partner in the partnership V.R. DeAngelis M.D.P.C. & R.T. Domingo M.D.P.C. (VRD/RTD). These cases concern amounts paid in 1993 and 1994 by the S corporations to VRD/RTD and its ensuing contributions of those amounts to the Severance Trust Executive Program Multiple Employer Supplemental Benefit Plan and Trust (STEP), a plan that was promoted to wealthy professionals as a welfare benefits fund that was part of a 10-or-more-employer plan described in section 419A(f)(6).[FN2] STEP used the contributions to purchase and pay the premiums on six whole life insurance policies, five of which were each written with respect to one or both spouses of each couple (with the exception of the Capizzis, who had no policy insuring either of their lives) and were each payable to the beneficiaries of the insured's choosing in the event of the insured's death. The sixth life insurance policy was written on the life of Kerry Quinn (Ms. Quinn), an employee of VRD/RTD who was its office manager.

> FN2. Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the dollar. We use the term "plan" for convenience and do not suggest that any part of the STEP plan is a bona fide plan for Federal income tax purposes.

For each subject year, respondent determined in the notice of final partnership administrative adjustment (FPAA) that VRD/RTD could not deduct the $585,000 it paid in that year to STEP as contributions to a welfare benefits fund. The FPAA stated in part that the payments were not ordinary and necessary business expenses under section 162(a).

Respondent determined in the notices of deficiency that the individual petitioners had the following deficiencies in their 1993 and 1994 Federal income taxes:

| Individual Petitioners | 1993 | 1994 |
|---|---|---|
| DeAngelises | $246,768 | $208,447 |
| Domingos | 185,422 | 184,932 |
| Durantes | 29,174 | 42,020 |
| Capizzis | 1,957 | 1,546 |

The deficiencies generally are based on two determinations. First, respondent determined that the payments that the S corporations made to VRD/RTD for contribution to the STEP plan were not deductible by the S corporations because they were not ordinary and necessary business expenses under section 162(a). Respondent accordingly increased the net amount of passthrough income received by each doctor from his S corporation. Second, respondent determined that each doctor received income under section 61(a) in the amount of the life insurance premiums that were paid by his S corporation on his behalf.

We decide whether the S corporations and VRD/RTD were

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                          Page 3
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526; T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

entitled to deduct the payments related to the STEP plan as ordinary and necessary business expenses under section 162(a). We hold they were not to the extent that the payments related to the life insurance written on a life of someone other than Ms. Quinn.[FN3] We also decide whether each doctor realized income in the amount of the life insurance premiums that were paid by his S corporation on his behalf. We hold he did not.

> FN3. We understand respondent to have conceded that the payments are deductible to the extent they relate to the insurance written on the life of Ms. Quinn.

## FINDINGS OF FACT

### 1. *Preliminaries*

*2 Some facts were stipulated. The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference. We find the stipulated facts accordingly. VRD/RTD had a legal address in the State of New York when its petition was filed. The individual petitioners resided in the State of New York when their petitions were filed.

### II. *Individual Petitioners*

#### A. *Overview*

Petitioner doctors are Vincent DeAngelis (Dr. DeAngelis), Rodolfo Domingo (Dr. Domingo), Keith Durante (Dr. Durante), and Anthony J. Capizzi (Dr. Capizzi) (collectively, doctors). During 1993 and 1994, each doctor wholly owned an S corporation that employed the doctor to provide his medical and surgical services for VRD/RTD. Each S corporation was a professional corporation (PC), the sole employee of which was its owner. The names of the PCs of Drs. DeAngelis, Domingo, Durante, and Capizzi were Vincent R. DeAngelis M.D.P.C., Rodolfo T. Domingo M.D.P.C., Keith Durante M.D.P.C., and Anthony J. Capizzi M.D.P.C., respectively.

Each doctor and his wife filed a joint Form 1040, U.S. Individual Income Tax Return, for each of the years 1993 and 1994. Each couple's returns reported compensation received from the doctor's PC during those years.[FN4]

> FN4. We use the term "compensation" to refer to wages, salaries, and the like. Unlike petitioners, we do not consider the term "compensation" to include the doctors' distributive shares of income from their PCs. See sec. 61(a)(1), (13) (distinguishing as separate items of gross income "Compensation for services, including fees, commissions, fringe benefits, and similar items" from "Distributive share of partnership gross income"); cf. *Campbell v. Commissioner*, 943 F.2d 815, 822 (8th Cir.1991), affg. in part and revg. in part on other grounds T.C. Memo.1990-162. Nor (as discussed below) does the STEP plan define the term "compensation" to include such distributive shares.

#### B. *Dr. DeAngelis*

During 1993, 1994, and 1995, Dr. DeAngelis's PC reportedly paid Dr. DeAngelis compensation of $928,000, $581,000, and $60,000, respectively. The DeAngelises' corresponding Federal income tax returns included those amounts in gross income. Dr. DeAngelis's PC did not reportedly pay Dr. DeAngelis any compensation thereafter.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                          Page 4
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

C. *Dr. Domingo*

During 1993, 1994, 1995, and 1996, Dr. Domingo's PC reportedly paid Dr. Domingo compensation of $753,000, $452,976, $485,843, and $62,000, respectively. The Domingos' corresponding Federal income tax returns included those amounts in gross income. Dr. Domingo's PC did not reportedly pay Dr. Domingo any compensation thereafter.

D. *Dr. Durante*

During 1993, 1994, 1995, and 1996, Dr. Durante's PC reportedly paid Dr. Durante compensation of $136,000, $240,000, $283,919, and $208,079, respectively. The Durantes' corresponding Federal income tax returns included those amounts in gross income. During 1998 through 2003, Dr. Durante's PC reportedly paid Dr. Durante compensation of $289,398, $340,527, $258,393, $250,604, $258,208 and $240,000, respectively. The Durantes' corresponding Federal income tax returns included those amounts in gross income. The record does not allow the Court to find the amount of compensation (if any) that Dr. Durante's PC reportedly paid Dr. Durante in 1997.

E. *Dr. Capizzi*

During 1993 and 1994, Dr. Capizzi's PC reportedly paid Dr. Capizzi compensation of $609,000 and $719,001, respectively. The Capizzis' corresponding Federal income tax returns included those amounts in gross income. During 1996 through 2003, Dr. Capizzi's PC reportedly paid Dr. Capizzi compensation of $336,240, $240,070, $272,043, $294,601, $293,331, $190,271, $194,130 and $148,423, respectively. The Capizzis' corresponding Federal income tax returns included those amounts in gross income. The record does not

allow the Court to find the amount of compensation (if any) that Dr. Capizzi's PC reportedly paid Dr. Capizzi in 1995.

III. *VRD/RTD*

A. *General Information*

*3 VRD/RTD was formed as a partnership on July 1, 1982, under the laws of New York. VRD/RTD provided medical and surgical services to its patients through the doctors and operated under the name "South Shore Surgical Specialists". VRD/RTD reported its income and expenses for Federal income tax purposes using the cash receipts and disbursements method. VRD/RTD filed 1993 and 1994 Forms 1065, U.S. Partnership Return of Income, for its taxable years ended December 31, 1993 and 1994, respectively.

B. *Partners and Employees*

During 1993 and 1994, the five partners of VRD/RTD were the four PCs of the doctors and a fifth PC owned by another doctor, Edgar Borrero (Dr. Borrero). The senior partner of VRD/RTD was Vincent R. DeAngelis M.D.P.C. The partners' percentages of profits, losses, and ownership of capital for 1993 were as follows:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                 Page 5
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

| Partner | Beginning of Year | End of Year |
|---|---|---|
| Vincent R. De Angelis M.D.P.C. | 35.09% | 25% |
| Rodolfo T. Domingo M.D.P.C | 25.81 | 23 |
| Anthony J. Capizzi M.D.P.C. | 20.58 | 24 |
| Edgar Borrero M.D.P.C. | 18.52 | 18 |
| Keith Durante M.D.P.C.[1] | 0 | 10 |

> FN1. Keith Durante M.D.P.C. became a partner of VRD/RTD on or about July 1, 1993.

The partners' percentages of profits, losses, and ownership of capital for 1994 were as follows:

| Partner | Beginning of Year | End of Year |
|---|---|---|
| Vincent R. De Angelis M.D.P.C | 25% | 34% |
| Rodolfo T. Domingo M.D.P.C. | 23 | 17 |
| Anthony J. Capizzi M.D.P.C. | 24 | 20 |
| Edgar Borrero M.D.P.C. | 18 | 17 |
| Keith Durante M.D.P.C. | 10 | 12 |

During 1993 and 1994, VRD/RTD employed nurses, office staff, and an office manager (i.e., Ms. Quinn). VRD/RTD had at least 29 employees during 1993 and at least 34 employees during 1994. VRD/RTD did not directly pay the doctors any compensation during either subject year.

C. *Arrangements With PCs*

VRD/RTD entered into arrangements with the PCs for the provision of the doctors' medical services. The doctors performed their services for the patients of VRD/RTD, and VRD/RTD billed the patients for the fees due on these services. VRD/RTD received payment of the fees, deposited the payments into its bank account, and reported the payments as income on its Forms 1065. Dr. Domingo performed services for VRD/RTD through the end of 1999; afterwards, through 2003, Dr. Domingo continued to work for his PC performing services for other than VRD/RTD. Dr. DeAngelis terminated his services with VRD/RTD on or about December 31, 2003.

D. *Partnership Agreement*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                          Page 6
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

The VRD/RTD partnership agreement in effect for the subject years (partnership agreement) was executed on June 19, 1990. The partnership agreement stated that Drs. DeAngelis and Domingo were employed by their PCs and that any future doctor who wished his PC to become a partner of VRD/RTD had to be employed by his PC. The partnership agreement stated that it was anticipated that Dr. DeAngelis would fully retire from VRD/RTD on July 1, 1994, and that Dr. Domingo would not retire until 1 year after Dr. DeAngelis retired. If Dr. DeAngelis continued working for VRD/RTD until at least July 1, 1995, the partnership agreement allowed Dr. Domingo to retire at the same time as Dr. DeAngelis or at any time after July 1, 1996. The partnership agreement provided for payments to be made to a doctor's PC in case the doctor became disabled.

IV. *STEP*

A. *Overview*

*4 STEP purports to provide eligible employees with severance benefits, funded entirely by their participating employer through the purchase of whole life insurance policies, and, if elected, an employer-provided optional life insurance benefit payable upon the death of a covered employee or an alternate insured.[FN4] STEP invested the contributions made to the STEP plan in whole life insurance policies issued by eight insurance companies; namely, Metropolitan Life Insurance Co. (MetLife), Allmerica Financial Life Insurance and Annuity Co., National Life Insurance Co. of Vermont, Prudential Life Insurance Co. of America, Equitable Life Assurance Society of the United States, ITT Hartford Life Insurance Co., New York Life Insurance and Annuity Corp., and Massachusetts Mutual Life Insurance Co. The life insurance policies insured the individuals covered by the STEP plan, and the STEP plan assets, as reported, consisted largely of the cash values of those policies. Insurance agents earned substantial commissions on the sales of the life insurance policies; e.g., $605,053 in 1994.

FN5. An employee's severance benefits were paid from the cash value of his or her whole life insurance policy.

Drs. DeAngelis, Domingo, and Durante (collectively, participating doctors) participated in the STEP plan through their PCs and VRD/RTD. Alvin Rapp (Mr. Rapp) was an authorized insurance agent of MetLife, and he recommended that all contributions to the STEP plan made on behalf of the participating doctors be invested in whole life insurance policies issued by MetLife. That recommendation was followed. Each whole life insurance policy related to a participating doctor required that a payment be made annually on December 28 for the policy year beginning on that date.

B. *Formation of the STEP Plan*

The originator of the STEP concept was Kenneth L. Katz (Mr. Katz), an insurance agent credentialed as a chartered life underwriter and a chartered financial consultant. In 1988, Mr. Katz asked his friend, Jeffrey Mamorsky (Mr. Mamorsky), to draft a plan that could be marketed as a tax-beneficial welfare benefits fund that complied with section 419A(f)(6). Mr. Mamorsky was an attorney practicing primarily in the area of employee benefits and compensation. Mr. Mamorsky later also served as counsel to the STEP plan; in that capacity, Mr. Mamorsky was available and willing to discuss with covered employees (at the expense of the STEP plan) the manner in which they should prepare their applications for benefits from the plan. The intent of the STEP plan was to create an incentive to buy, and thus to generate the sale of, whole life insurance policies through a claim of permissible tax avoidance and the ability to pay and deduct premiums on the purchased policies which would eventually be transferred to and owned by the insureds. Many participants in the STEP plan believed

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                    Page 7
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

that the plan was one of deferred compensation.

Mr. Mamorsky prepared an initial version of the STEP plan on or about December 15, 1989, and Mr. Katz began operating the STEP plan at that time. Mr. Mamorsky prepared a second version of the STEP plan in 1990. Mr. Mamorsky wrote other and all versions of the STEP plan through June 2001, with an understanding that the deductibility of contributions was critical both to the marketability of the STEP plan and to the operation and existence of STEP. The various versions of the STEP plan through June 2001 included the following:

| | |
|---|---|
| Version 1: | Executed on December 15, 1989 |
| Version 2: | Version 1 Amended and Restated on July 26, 1990 |
| Version 3: | Executed on January 30, 1992 |
| Version 4: | Executed on December 29, 1993 |
| Version 5: | Executed as of November 1, 1994 |
| Version 6: | Executed as of February 14, 1997 |
| Version 7: | Executed as of June 11, 2001 |

*5 The four versions executed in or after 1993 were stated as effective as of January 1, 1993.[FN5]

FN6. There is also a 1992 version of the STEP plan for MetLife and, beginning in February 1997, separate plans and trusts for the eight insurance companies whose policies were sold through STEP. According to petitioners, the participating doctors were covered by version 3 when VRD/RTD adopted the STEP plan on or about Dec. 20, 1993, and were covered by version 4 as of Dec. 29, 1993.

C. *Trustees, Administrators, and Sponsors*

Connecticut National Bank was the STEP plan trustee from the plan's inception through April 1, 1992. The successor trustees were United States Trust Co. of New York (U.S.Trust), Mellon Trust of New York (Mellon Trust), and STEP Plan Services, Inc. (SPSI). U.S. Trust served as trustee from April 1, 1992, through February 14, 1997; Mellon Trust served as trustee from February 14, 1997, through February 2002; and SPSI served as trustee from February 2002 to date.

STEP, Inc., served as the STEP plan administrator from the plan's inception through July 26, 1990. Teplitzky & Co., L.L.C. (Teplitzky & Co.), acting primarily through its principal Jeffrey

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                    Page 8
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

Teplitzky (Mr. Teplitzky), was the successor plan administrator from July 26, 1990, through February 7, 2002. The current plan administrator is SPSI. During the relevant time, Daniel E. Carpenter (Mr. Carpenter) had sole signatory authority on behalf of SPSI and served as its chairman.

STEP, Inc., also served as the STEP plan sponsor from the plan's inception until April 1, 1992. U.S. Trust served as the successor plan sponsor from April 1, 1992, until February 14, 1997, when first STEP, Inc., and subsequently Teplitzky & Co. took over as successor plan sponsor. On February 7, 2002, Teplitzky & Co. resigned as plan sponsor and appointed SPSI as the successor plan sponsor.

During the subject years, Teplitzky & Co., acting as the STEP plan administrator, ran the daily operation of the STEP plan. U.S. Trust, as plan sponsor, interacted with the insurance companies whose policies were owned by the STEP plan and conducted the plan's marketing activities.

D. *Marketing Documents*

The STEP plan marketing documents set forth detailed examples of when severance benefits would and would not be paid under the plan.[FN7] These examples allowed individuals covered by the plan to time their departures from their businesses and to phrase their requests for severance benefits so that benefits would be paid to them under the STEP plan as they anticipated. The STEP plan marketing documents warned participants that "Benefits accrued for an employee are forfeited if the employee does not qualify for benefits under a bona fide severance as determined by STEP's Independent Fiduciary".[FN8] The STEP plan marketing documents advised participating employers that deductions for contributions to the STEP plan could be ultimately disallowed but that only taxes and interest, and no additional amounts such as penalties,

would then be due because STEP had received an "opinion letter" from Mr. Mamorsky stating that it was "more likely than not" that the deductions would be allowed.

FN7. Upon adopting the plan, each participating employer also was provided examples of qualifying severance events.

FN8. In operation, however, forfeitures could occur only when projected plan assets equaled or exceeded projected plan liabilities on an employer by employer basis.

E. *Independent Fiduciary*

The STEP plan administrator had the sole authority to make determinations relating to "dismissal", "Total Disability", or "death", conditions that were prerequisites to the receipt of benefits from the STEP plan as written. In making those determinations, the plan administrator was required to rely on rules and regulations established by the STEP plan "Independent Fiduciary". Jules Pagano (Mr. Pagano) was the independent fiduciary of the STEP plan from its inception through February 2002; the STEP plan did not have any independent fiduciary thereafter. While serving as independent fiduciary, Mr. Pagano was authorized to and routinely did provide individuals seeking to obtain benefits under the plan with personal guidance on how to frame their requests so that they would receive their anticipated benefits under the plan as written. Upon receiving an actual claim for benefits, Mr. Pagano and the STEP plan administrator relied upon the documents submitted to them by the claimant and did not perform an independent investigation or verification of the claim. If a participant's claim for benefits as submitted did not qualify for benefits under the STEP plan, the STEP plan allowed the participant to reform his or her claim in order to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                          Page 9
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

receive his or her anticipated benefits.

### F. *Version 4 of the STEP Plan*[FN9]

> FN9. In our findings of fact set forth under this subheading, section references are to version 4 of the STEP plan.

*6 Section 1.11, 1.13, and 1.14 of the STEP plan defines the terms "Covered Employee", "Eligible Employee", and "Employee". Section 2.1(c) states that "The Employer shall transmit to the Plan Administrator written notice of any substantial or unusual change in a Covered Employee's Compensation or status (e.g., from fulltime to parttime) as it occurs, but in any event no later than 30 days after the change occurs". *Section 3.1 states that "A Covered Employee's Severance Benefit shall be determined in accordance with the Severance Benefit formula elected in the Adoption Agreement. In no event, however, may a Covered Employee's Severance Benefit exceed two times his Compensation paid during the twelve full-month period immediately preceding his Termination of Employment".*

Section 3.3 states that *an employer shall elect in the adoption agreement either a "fixed benefit" or a "flexible benefit". As to a fixed benefit, section 3.3 states that the benefit payable to a covered employee shall equal the sum of the future service component for each year of participation plus the past service component. The future service component equals for each year of participation the amount of that year's "Compensation* [defined as the "amount specified by the Employer in the Adoption Agreement"] *multiplied by the Severance Benefit percentage elected by the Employer in the Adoption Agreement". The past service component equals the product of (1) the benefit percentage elected by the employer in the adoption agreement, (2) a fraction not to exceed 1, the* numerator of which is the covered employee's past service and the denominator of which is 10, and (3) the covered employee's total compensation for the 10 years preceding the year of termination of employment.

As to a flexible benefit, section 3.3 allows a different percent *of compensation to be elected for each year of service and states that the formula for computing a severance benefit is made applicable to the employer's contribution each year. In addition, there is a provision for adjustments each year based on benefits provided to other employees, forfeitures, investment earnings, and cost of insurance for the covered employee.*

Section 4.1 states that *the employer must annually contribute to the STEP plan such amounts as are calculated by the plan actuary to provide for severance benefits of its covered employees. The total amount to be contributed by all employers is "based upon reasonable actuarial assumptions and methods taking into account the experience of the Plan, as an undivided and unweighted pool with no differentiation as to Covered Employees (other than those differentiations described below) or Participating Employers". The amount to be contributed by each employer is to be its allocable portion of the total for all employers.*[FN10]*Section 4.1 also states that the employer must contribute the cost of 1-year term life insurance for any life insurance benefit elected in the adoption agreement.*

> FN10. In operation, the STEP plan neither employed a plan actuary nor determined amounts to be contributed by the employers.

*7 Section 5.2(a) states that a participating employer must pay the STEP plan the annual cost of equivalent 1-year term insurance if the employer elects a life insurance benefit for its

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                    Page 10
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

employees. Section 5.2(b) states that an employee may elect additional life insurance beyond the amount elected by the employer and that the employer must pay the STEP plan the annual cost of the equivalent 1-year term insurance and the employee must reimburse the employer for the additional cost. Section 5.2(c) states that the insurance benefit payable to the beneficiary of a covered employee is equal to the amount elected by the employer plus the amount elected by the employee. Section 5.2(f) states that the STEP plan may name the beneficiary, or the insured may name a beneficiary as long as the employer reimburses the STEP plan. Section 5.2(g) states that if the employer does not pay amounts due on the policy for the death benefit, STEP may declare the policy lapsed or surrender the policy, or the beneficiary will be changed to STEP. Section 5.2(h) states that if the employer fails to make required payments, the insured may buy the policy from STEP for the policy value.

Section 10.4(a) states that an employer can withdraw from the STEP plan at any time and that the employees will have frozen benefits equal to the amounts they would have been eligible for on the dates of withdrawal. Section 10.5 states that if an employer fails to make a required contribution, it will be treated as if it withdrew on that date, and it will be treated the same as in the case of a withdrawal under section 10.4.

Section 11.1 and 11.3 allows the plan sponsor to "amend, modify or delete, in whole or in part, any provision of the Plan, provided the duties and responsibilities of the Trustee shall not be altered without its written consent" and states that "no amendment or reorganization may be made to this Plan which shall change or alter the fundamental purpose of the Plan expressed in the preface hereto". Section 11.2 allows the plan sponsor to reorganize the participating employers into other or separate plans.

## V. *VRD/RTD's Introduction to the STEP Plan*

### A. *Introduction to the Plan*

In late 1993, Drs. DeAngelis and Domingo were engaged in estate planning with their accountant, Richard Freeman (Mr. Freeman), and an estate planning attorney, Victor Finmann (Mr. Finmann). Mr. Freeman advised Dr. DeAngelis to acquire additional life insurance coverage and suggested that he consider a severance pay plan for VRD/RTD. Mr. Freeman introduced Dr. DeAngelis to Mr. Rapp. Mr. Rapp discussed the STEP plan with Dr. DeAngelis and Mr. Freeman, characterizing the plan as a way to receive additional insurance coverage and to provide severance benefits, both with pretax dollars. Mr. Rapp recommended to Dr. DeAngelis that VRD/RTD form a section 419 welfare benefit trust because, he stated, it would secure immediate Federal income tax deductions, allow the owner-employees to accumulate significant wealth on a tax-deferred basis, secure assets with insurance company guaranties, and protect assets from creditors. Dr. DeAngelis discussed the STEP plan with the other doctors, their wives, Mr. Finmann, and others. Mr. Finmann advised Dr. DeAngelis that he was skeptical as to the validity of the STEP plan, as promoted.

### B. *Decision to Join Plan*

*8 On December 20, 1993, Dr. DeAngelis decided on behalf of VRD/RTD to join the STEP plan and to provide coverage thereunder for the participating doctors and for Ms. Quinn. Dr. Borrero declined to participate in the STEP plan after hearing the presentation of the representatives of STEP. Dr. Capizzi initially expressed an intent to participate in the STEP plan but subsequently decided not to participate in the plan.

### C. *Illustrations*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                    Page 11
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

In or about late 1993, Mr. Rapp provided Drs. DeAngelis and Domingo with life insurance policy illustrations reflecting varying amounts of life insurance benefits and premium costs. Mr. Rapp informed Dr. Domingo that his projected severance benefit after 5 years would be $253,000 if he made two annual contributions of $225,000 and that the projected benefit would increase annually by approximately $238,000 for each additional $225,000 contribution that he made annually beginning in year 3. Mr. Rapp informed Dr. DeAngelis that his projected severance benefit after 3 years would be $312,000 if he made two annual contributions of $300,000 and that the projected benefit would increase by approximately $320,000 for each additional $300,000 contribution that he made annually beginning in year 3.

## VI. *VRD/RTD's Adoption of the STEP Plan*

### A. *Execution of Adoption Agreement*

On or about December 20, 1993, Dr. DeAngelis executed an adoption agreement for the STEP plan on behalf of VRD/RTD, making VRD/RTD a participating employer in the STEP plan effective as of January 1, 1993. VRD/RTD consented in the agreement to any future amendment of the STEP plan.

VRD/RTD elected in the adoption agreement to provide severance benefits to its eligible employees in the amount of 10 percent of an employee's compensation for each year of participation, with no credit for past service. VRD/RTD also elected not to provide the optional life insurance benefit. Drs. DeAngelis and Domingo understood that in order for VRD/RTD to claim deductions for its contributions to STEP they had to couch any subsequent application for benefits in terms that appeared to make the severance event nonvolitional.

### B. *Relevant Provisions in the Adoption Agreement*

Eligible employees were defined in the adoption agreement as all full-time employees, other than controlling owners, who were 21 and had completed 1 year of service and whose job title was "doctor" or "office administrator/business mgr". A "controlling owner" was defined in the adoption agreement as a person who owned more than a 25-percent voting interest in the participating employer, unless four or fewer other persons owned in the aggregate a greater voting interest than the person. The adoption agreement stated that the eligible employees were Drs. DeAngelis, Domingo, Durante, and Capizzi, and Ms. Quinn, and that Dr. Borrero was an employee who was excluded.[FN11] The adoption agreement defined the term "compensation" as "Total Compensation paid during the applicable period, including wages, bonuses and over time [sic], etc., but not including deferred compensation other than compensation deferred pursuant to Code Section 401(k). Compensation shall also include salary reduction contributions excludable from gross income pursuant to Code Section 125."

> FN11. As noted above, Dr. Capizzi subsequently decided not to participate in the STEP plan. Ms. Quinn was the only employee of VRD/RTD who was covered by the STEP plan.

### C. *Other Relevant Provisions*

*9 According to the STEP plan, a covered employee was purportedly eligible to receive a severance benefit from the plan upon termination of employment (except for termination for cause) under the following circumstances: "dismissal; any termination of employment unless such termination constitutes a 'voluntary separation without good cause' within the meaning

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                     Page 12
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

of New York State Unemployment Insurance Law; total disability; or death.[FN12]The STEP plan stated that benefits would normally start on the first day of the second month after approval of the claim for benefits, that the usual form of payment would be in equal monthly installments over 24 months from the date of the employee's termination, that the first installment would include any payments delayed because of processing, and that severance benefits could not exceed two times the employee's last 12 months of compensation before termination of employment. The STEP plan did not limit the amount of life insurance benefits that could be received by a covered employee and stated that the optional life insurance benefit (if elected) would be received in addition to the severance benefit if the covered employee died while employed by the participating employer. The STEP plan stated that a participating employer could choose to withdraw from the plan, that a participating employer could constructively withdraw from the plan by failing to make an annual contribution or by violating a plan provision, and that upon withdrawal, any optional life insurance benefit could be discontinued or purchased from the plan by the employee or alternate insured at a cost equal to the policy's value (defined as the amount that would be paid upon surrender of the coverage determined before the application of surrender charges). The STEP plan stated that the optional life insurance benefit also could be discontinued if the covered employee terminated service with the employer, the employer failed to make a contribution with respect to the coverage, or the covered employee ceased to be a covered employee. According to the STEP plan, any life insurance that was not purchased could be surrendered by the trustee or continued with the plan as beneficiary.

> FN12. In operation, the STEP plan paid benefits to participants even though the covered employee did not fall within one of these circumstances.

VII. *VRD/RTD's Contributions to STEP*

A. *Forwarding Fees*

The PCs of the participating doctors forwarded to VRD/RTD amounts required by STEP to pay the premiums due on the whole life insurance policies written on the lives of the participating doctors. The PCs and VRD/RTD referred to these transactions as "forwarding fees". During the subject years, VRD/RTD received the following amounts of forwarding fees from the PCs:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                           Page 13
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

| PC | 1993 | 1994 |
|---|---|---|
| Vincent R. DeAngelis M.D.P.C. | $300,000 | $300,000 |
| Rodolfo T. Domingo M.D.P.C. | 225,000 | 225,000 |
| Keith Durante M.D.P.C. | 50,000 | 50,000 |
| Total | 575,000 | 575,000 |

The PCs deducted these forwarding fees as expenses in the year of payment.

*10 VRD/RTD recorded its receipt of the forwarding fees from the PCs as "Fee Income-DeAngelis PC", "Fee Income-Domingo PC", and "Fee Income-Durante PC", respectively. VRD/RTD recorded that these amounts were received from the PCs as pension contributions with respect to the participating doctors. VRD/RTD also received a total of $10,000 in each of the years 1993 and 1994, from the five PCs that were partners in VRD/RTD. The $10,000 was forwarded in each year to the STEP plan to pay the premium due on the policy insuring the life of Ms. Quinn. Of the $10,000, Dr. Capizzi's PC paid $2,400 in 1993 and $2,000 in 1994. The record does not allow the Court to find the portion of the $10,000 in either year that was paid by any of the other PC partners.

During each of 1993 and 1994, VRD/RTD contributed $585,000 to the STEP plan and recorded each of these contributions as a "Pension Contribution". VRD/RTD's partnership return reported the forwarding fees received from the PCs as income and claimed a corresponding deduction for "Retirement plans, etc." VRD/RTD did not make any further contribution to STEP, and neither STEP nor any petitioner directly paid any further premium on the subject life insurance policies after the premiums were paid on December 28, 1994, for the policy year beginning on that date.

B. *Issuance of Policies*

When VRD/RTD adopted the STEP plan, all of VRD/RTD's contribution to the plan was invested in whole life insurance policies issued by MetLife and sold by Mr. Rapp. The particular policies were selected by the participating doctors in consultation with Mr. Rapp. All of the policies were participating whole life insurance polices, with the additional feature that extra premiums could be paid to purchase paid-up additions rider insurance (PUAR). A PUAR feature, when elected, essentially prefunds the annual premiums for a policy and accumulates any extra proceeds in the policy until needed to pay premiums in a later year.

As of December 28, 1993, MetLife issued the following six life insurance policies with respect to VRD/RTD's initial contribution to the STEP plan:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                      Page 14
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

| Insured | Policy # | Type of Policy | Face Value |
|---------|----------|----------------|-----------|
| Dr. DeAngelis | 931250799PR | Whole life | $2,156,442 |
| Both DeAngelises | 931250800A | Survivor whole life | 4,818,200 |
| Dr. Domingo | 931250797PR | Whole life | 1,327,656 |
| Both Domingos | 931250798A | Survivor whole life | 3,500,000 |
| Dr. Durante | 931250795PR | Whole life | 1,804,135 |
| Ms. Quinn | 931250796PR | Whole life & 409,184 | |

Four of these policies were individual whole life insurance policies separately insuring the lives of Ms. Quinn and each of the participating doctors. The other two policies were joint and survivor whole life insurance policies (survivor whole life policies) or, in other words, life insurance that was not payable to the beneficiary until the deaths of both insureds. One survivor whole life policy insured both DeAngelises (DeAngelises survivor whole life policy), and the other survivor whole life policy insured both Domingos (Domingos survivor whole life policy). Neither Jeanette DeAngelis nor Bernadette Domingo was an employee of VRD/RTD, and the survivor whole life insurance policies were purchased by Drs. DeAngelis and Domingo as part of their Federal estate tax plans. On December 28, 1993, Dr. DeAngelis was 60 years old, Jeanette DeAngelis was 61 years old, and each of the Domingos was 61 years old. Also on that date, Dr. Durante was 37 years old, and Ms. Quinn was 38 years old. Dr. DeAngelis canceled other life insurance that he personally owned so that insurance on the lives of him and his wife could be purchased through the STEP plan with pretax dollars.

*11 The initial owner of each of the six policies was U.S. Trust, as trustee of the STEP plan. When U.S. Trust was replaced as trustee, the successor trustee was listed as owner. As further discussed below, in 2001 STEP transferred to the Domingos ownership of the two policies written on the lives of one or both of them; in 2002, STEP transferred to Dr. DeAngelis ownership of the policy written on his life; and in 2003, STEP transferred ownership of each of the remaining policies to the insured or insureds named on the policy.

The insured doctors designated the beneficiaries for their policies, and Ms. Quinn designated the beneficiaries for her policy; the STEP plan trustee was never listed as a beneficiary of any of the policies. The beneficiaries of the subject policies were:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

| *Insured* | *Beneficiary* |
|---|---|
| Dr. DeAngelis | DeAngelis Family Limited Partnership [1] |
| Both DeAngelises | DeAngelis Family Irrevocable Life Insurance Trust |
| Dr. Domingo | Domingo Family Irrevocable Life Insurance Trust |
| Both Domingos | Domingo Family Irrevocable Life Insurance Trust |
| Dr. Durante | Kathleen Durante |
| Ms. Quinn | Mother, 2 sisters, and 3 brothers |

FN1. *The original beneficiary was Dr. DeAngelis's wife. On or about Sept. 6, 2002, MetLife changed the beneficiary to the DeAngelis Family Limited Partnership pursuant to the request of Dr. DeAngelis.*

Mr. Rapp recommended that the beneficiary of each of the survivor whole life policies be listed as an insurance trust in order to minimize the Federal estate tax consequences to the family of the insured, and Drs. DeAngelis and Domingo followed that recommendation. STEP wanted any life insurance benefit to be paid directly to the personal beneficiary of the insured, rather than to or through the STEP plan, because STEP did not want the STEP plan to be overfunded if and when it were to receive that benefit.

*Two annual premiums were paid on each of the six policies,* one for the policy year beginning December 28, 1993, and the other for the policy year beginning December 28, 1994. As to each policy, those premiums included the base premiums necessary to fund the whole life insurance component of the policy and premiums for PUAR. These payments were consistent with illustrated payments contained in correspondence from Mr. Rapp. The base premiums and PUAR premiums on the policies were as follows:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

| Insured | Policy # | Base Premium | PUAR | Total | |
|---|---|---|---|---|---|
| Dr. DeAngelis | 931250799PR | $81,596.64 | $98,403.36 | | $180,000 |
| Both DeAngelises | 931250800A | 103,762.66 | 16,237.34 | | 120,000 |
| Dr. Domingo | 931250797PR | 53,093.13 | 52,656.87 | | 105,750 |
| Both Domingos | 931250798A | 77,845.00 | 42,155.00 | | 120,000 |
| Dr. Durante | 931250795PR | 21,996.32 | 28,003.68 | | 50,000 |
| Ms. Quinn | 931250796PR | 6,173.67 | 5,826.33 | | 12,000 |
| Total | | | | | 587,750 |

Premiums were paid in the 2 years as follows:

| Insured | Policy # | 1993 | 1994 |
|---|---|---|---|
| Dr. DeAngelis | 931250799PR | $180,000 | $178,625 |
| Both DeAngelises | 931250800A | 120,000 | 120,000 |
| Dr. Domingo | 931250797PR | 105,750 | 104,375 |
| Both Domingos | 931250798A | 120,000 | 120,000 |
| Dr. Durante | 931250795PR | 50,000 | 50,000 |
| Ms. Quinn | 931250796PR | 12,000 | 12,000 |
| Total [1] | | 587,750 | 585,000 |

FN1. We recognize that VRD/RTD deducted for 1993 contributions totaling $585,000. In that the premiums paid in 1993 totaled $587,750, we are unable to find in the record an explanation as to who paid the extra $2,750.

*12 The funds used to pay the premiums attributable to the two policies written on the lives of one or both of the DeAngelises came from Dr. DeAngelis's PC, the funds used to pay the premiums attributable to the two policies written on the lives of one or both of the Domingos came from Dr. Domingo's PC, and the funds used to pay the premiums for the policy written on the life of Dr. Durante (Dr. Durante policy) came from his PC. The funds used to pay the premiums attributable to the policy written on the life of Ms. Quinn (Ms. Quinn policy) were taken on some apportioned basis from all five PCs that were partners in VRD/RTD.[FN13] In each of those cases, the funds used to pay the premiums went from each PC to VRD/RTD, from VRD/RTD to the STEP plan, and from the STEP plan to MetLife.

FN13. As discussed above, the record does not allow the Court to find the specifics of that apportionment other than as to Dr. Capizzi's PC.

C. Additional Correspondence

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                          Page 17
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

On September 19, 1995, Mr. Katz provided Mr. Freeman with revised illustrations for the life insurance policies written with respect to Drs. DeAngelis and Domingo. Those illustrations had been requested by Drs. DeAngelis and Domingo to help them determine whether they wanted to make any additional contributions on their policies. The illustrations assumed that premiums were paid for only 3 years, 4 years, or 5 years. Mr. Katz informed Mr. Freeman that the projected severance benefits for Drs. DeAngelis and Domingo were approximately the cash values in their policies. Mr. Katz informed Mr. Freeman that he was formulating illustrations for the policies that would show a cash withdrawal of severance benefits and the premium required to continue the policies thereafter. On September 20, 1995, Mr. Rapp provided Drs. DeAngelis and Domingo with answers from MetLife and STEP to questions asked by those doctors.

On or about October 30, 1995, Mr. Katz provided Dr. DeAngelis with revised illustrations for his insurance policies showing only 2 years of out-of-pocket premium payments. Mr. Katz also provided Mr. Freeman with various other illustrations for the insurance policies written on the lives of Drs. DeAngelis and Domingo.

VIII. *Payments of Premiums*

A. *Dr. DeAngelis Policy*

The December 28, 1993 and 1994, premiums of $81,596.64 on the policy written on the single life of Dr. DeAngelis (Dr. DeAngelis policy) were paid timely, [FN14] and PUAR was purchased with additional premiums of $98,403.36 in 1993 and $97,028.36 in 1994. In 1996, the premium due on this policy as of December 28, 1995, was paid timely with a dividend

withdrawal of $16,658.17 and a portion of a withdrawal of $123,004.98 from the PUAR.[FN15]As to the withdrawal from the PUAR, $64,938.47 was used to pay the December 28, 1995, premium on this policy, and $58,066.51 was used to pay the December 28, 1995, premium on the *DeAngelises* survivor whole life policy. In 1997, the premium due on December 28, 1996, on the Dr. DeAngelis policy was paid timely with a dividend withdrawal of $15,247.77 and a withdrawal of $66,348.87 from the PUAR. The premium due on December 28, 1997, was not paid timely, and the policy lapsed for nonpayment of premiums. MetLife converted the policy to nonforfeiture extended term insurance with a face value of $2,192,891 through August 21, 2000, at which time it was set to be depleted of its cash value and thus to terminate without value.[FN16]

> FN14. Although the premiums were not actually paid until after the due dates, we consider them to have been paid "timely". To this end, we understand each of the subject insurance policies to have allowed a grace period after the due date so that a premium paid during that period would be timely in the sense that the policy would not lapse.

> FN15. A dividend withdrawal relates to a dividend payable on a policy.

> FN16. Extended term insurance is a life insurance policy nonforfeiture option that may be exercised when the policy lapses because of a failure to pay a premium owed on the policy. Under this option, the cash value of a lapsed policy is used to maintain the full original death benefit until the cash value is depleted.

B. *DeAngelises Survivor Whole Life Policy*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                        Page 18
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

*13 The December 28, 1993 and 1994, premiums of $103,762.66 on the DeAngelises survivor whole life policy were paid timely, and PUAR was purchased in each year with additional premiums of $16,237.34. In 1996, the premium due on December 28, 1995, was paid timely with a dividend withdrawal of $11,563.68, a withdrawal of $34,133.47 from the PUAR, and the above-referenced $58,066.51 withdrawal from the Dr. DeAngelis policy. In 1997, the premium due on December 28, 1996, was paid with a dividend withdrawal of $12,363 and a policy loan of $91,399.66. The premium due on December 28, 1997, was not paid timely, and the policy lapsed for nonpayment of the premium. MetLife converted the policy to participating reduced paid-up insurance with a face value of $588,731.[FN17]

> FN17. A reduced paid-up feature is another life insurance policy nonforfeiture option that may be exercised when the policy lapses because of a failure to pay a premium owed on the policy. If such a feature is exercised, the remaining cash value of the policy is used to purchase a single premium life insurance policy with a lower death benefit. While the death benefit is reduced, the cash value in the policy is used up more slowly than under other nonforfeiture options.

On or about August 23, 1999, upon the request of Dr. DeAngelis (and in connection with a similar request of Dr. Domingo with respect to the Domingos survivor whole life policy), the DeAngelises survivor whole life policy was reinstated by MetLife to the full face value and converted retroactively to a policy with an automatic premium loan (APL) provision.[FN18]That feature was then applied to pay the premiums of $103,762.66 due on December 28, 1997 and 1998, through an APL of $207,525.32. MetLife's stated reason for reinstating the DeAngelises survivor whole life policy was

that the policy had lapsed because of "company error"; specifically, MetLife stated, Dr. DeAngelis wanted loans to be made automatically from the policy to pay the premiums and was not advised by the broker that the policy was set up with a nonforfeiture option of reduced paid-up insurance. The DeAngelises survivor whole life policy lapsed again after the nonpayment of the premium due on December 28, 1999 (the cash value in the policy was insufficient to support an APL), and in October 2000 was converted to participating reduced paid-up insurance with a face value of $669,547.

> FN18. APL provisions allow an insurance company to pay a premium due on a policy by way of a loan taken out against the cash value of the policy. The loan is subject to interest charges and affects the policy's cash value only as a potential reduction of that value. The total amount of outstanding loans on the policy is usually less than the policy's cash value because the policy will generally lapse when the total amount of the loans exceeds that cash value.

## C. Dr. Domingo Policy

The December 28, 1993 and 1994, premiums of $53,093.13 on the policy written on the single life of Dr. Domingo (Dr. Domingo policy) were paid timely, and PUAR was purchased with additional premiums of $52,656.87 in 1993 and $51,281.87 in 1994. In 1996, the premium due on December 28, 1995, was paid timely with a dividend withdrawal of $10,358.01 and a withdrawal of $42,735.12 from the PUAR. In 1997, the premium due on December 28, 1996, was paid timely with a dividend withdrawal of $10,416.38 and a withdrawal of $42,676.75 from the PUAR. The premium due on December 28, 1997, was not paid timely, and the policy lapsed for nonpayment of the premium. MetLife continued the policy as nonparticipating paid-up term insurance with a face value of $1,377,206 through December 1, 2000, at which time it was set to be depleted of its cash value and thus to terminate

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

808

T.C. Memo. 2007-360                                                                                  Page 19
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

without value.

### D. *Domingos Survivor Whole Life Policy*

The December 28, 1993 and 1994, premiums of $77,845 on the Domingos survivor whole life policy were paid timely, and PUAR was purchased in each year with additional premiums of $42,155. In 1996, the premium due on December 28, 1995, was paid timely with a dividend withdrawal of $8,960 and a withdrawal of $68,885 from the PUAR. In 1997, the premium due on December 28, 1996, was paid timely with a dividend withdrawal of $9,616, a withdrawal of $21,407 from the PUAR, and a policy loan of $46,820. The premium due on December 28, 1997, was not paid timely, and the policy lapsed for nonpayment of the premium. MetLife converted the policy to reduced paid-up insurance with a face value of $511,542.

*14 On or about October 19, 1999, upon the request of Dr. Domingo (and in connection with the above-referenced similar request of Dr. DeAngelis), the Domingos survivor whole life policy was reinstated by MetLife to the full face value and converted retroactively to a policy with an APL provision. That feature was then applied to pay the premiums of $77,845 due on December 28, 1997 and 1998, through an APL of $155,690. MetLife's stated reason for reinstating the Domingos survivor whole life policy in 1999 was that the policy had lapsed because of "company error"; specifically, MetLife stated, Dr. Domingo wanted loans to be made automatically from the policy to pay premiums and was not advised by the broker that the policy was set up with a nonforfeiture option of reduced paid-up insurance. The Domingos survivor whole life policy lapsed again after the nonpayment of the premium due on December 28, 1999 (the cash value in the policy was insufficient to support an APL), and in 2000 was converted to participating reduced paid-up insurance with a face value of $579,263.

### E. *Dr. Durante Policy*

The December 28, 1993 and 1994, premiums of $21,996.32 on the Dr. Durante policy were paid timely, and PUAR was purchased in each year with additional premiums of $28,003.68. In 1996, the premium due on December 28, 1995, was paid timely with a dividend withdrawal of $1,881.58 and a withdrawal of $20,114.74 from the PUAR. In 1997, the premium due on December 28, 1996, was paid timely with a dividend withdrawal of $1,618.17 and a withdrawal of $20,378.15 from the PUAR. The premium due on December 28, 1997, was not paid timely, and the policy lapsed for nonpayment of the premium. MetLife continued the policy as nonparticipating paid-up term insurance with a face value of $1,864,269 through February 1, 2005, at which time it was set to be depleted of its cash value and thus to terminate without value.

### F. *Ms. Quinn Policy*

The December 28, 1993 and 1994, premiums of $6,173.67 on the Ms. Quinn policy were paid timely, and PUAR was purchased in each year with additional premiums of $5,826.33. In 1996, the premium due on December 28, 1995, was paid timely with a dividend withdrawal of $422.06 and a withdrawal of $5,751.61 from the PUAR. In 1997, the premium due on December 28, 1996, was paid timely with a dividend withdrawal of $337.18 and a withdrawal of $5,836.49 from the PUAR. The premium due on December 28, 1997, was not paid timely, and the policy lapsed for nonpayment of the premium. MetLife continued the policy as nonparticipating paid-up term insurance with a face value of $410,881 through May 7, 2003, at which time it was set to be depleted of its cash value and thus to terminate without value.

### IX. *Dispute of Drs. DeAngelis and Domingo*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                Page 20
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

In 1999, Dr. DeAngelis received a statement from STEP showing that the death benefit for the DeAngelises survivor whole life policy had decreased by approximately $3.5 million. The statement caused Dr. DeAngelis to write letters to STEP, Teplitzky & Co., and Mr. Rapp, requesting an explanation for the decrease in value. Dr. DeAngelis (and ultimately Dr. Domingo) also retained an attorney as to this matter.

**\*15** On investigation, Dr. DeAngelis concluded that the policies had lapsed for nonpayment of premiums, contrary to the advice that he had received at the inception of his participation in STEP that the policies would be self-sustaining after the making of the first two contributions. Because the option on each policy to pay the annual premiums through an APL had not been elected on the insurance application form, each of the six subject policies lapsed as of the end of 1997.

The failure to make the APL election on the insurance application forms was partially that of Mr. Rapp, who misunderstood the expressed intent of Drs. DeAngelis and Domingo that the APL election be made on their policies. After the lapse of the policies, much correspondence on the subject ensued between Drs. DeAngelis and Domingo and their lawyer, on the one hand, and MetLife, Mr. Rapp, and/or Teplitzky & Co., among others, on the other hand, and Drs. DeAngelis and Domingo threatened to file a lawsuit as to the matter. Drs. DeAngelis and Domingo sought from MetLife the reinstatement of their and Ms. Quinn's single individual policies as reduced paid-up insurance retroactively to the original lapse date.

### X. Reinstatement of Policies

### A. Overview

On January 24, 2002, Marcia McDermott (Ms. McDermott), an internal consultant for MetLife, asked MetLife to reinstate the lapsed policies of Dr. DeAngelis and Ms. Quinn as paid-up insurance retroactively to the original lapse date, as if the policies had never lapsed. Previously, Ms. McDermott had made a similar request as to the Dr. Domingo policy. Because Dr. Durante did not ask Ms. McDermott to seek a similar reinstatement of the Dr. Durante policy, Ms. McDermott did not ask MetLife to reinstate the Dr. Durante policy.

### B. Dr. Domingo Policy

STEP transferred ownership of the Dr. Domingo policy to Dr. Domingo in or about November 2001. Although the policy technically had no value, Dr. Domingo wanted the policy because Ms. McDermott had agreed to reinstate the policy as a reduced paid-up policy retroactive to December 28, 1997. Subsequently, pursuant to the request of Dr. Domingo, MetLife changed the Dr. Domingo policy to reduced paid-up insurance retroactively effective to December 28, 1997, with a face value of $195,924. MetLife stated in part that it was making this change because neither Dr. Domingo nor the STEP plan trustee had received timely notice of either the lapse of the policy or multidistrict litigation involving MetLife's marketing practices; the trustee had directed MetLife to send all mail to the trustee in care of the STEP plan administrator. Following this change, the Dr. Domingo policy has continued as participating reduced paid-up insurance.

From December 28, 1993, through the present, Dr. Domingo received life insurance coverage of $195,924 to $1,377,206 through the Dr. Domingo policy. As of December 28, 2005, the policy's death benefit and net cash surrender value were $267,034.57 and $185,025.58, respectively.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                          Page 21
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

### C. Dr. DeAngelis Policy

*16 On or about January 24, 2002, the ownership of the Dr. DeAngelis policy was changed to his name. Shortly thereafter, the Dr. DeAngelis policy was changed from nonforfeiture extended term insurance to participating reduced paid-up insurance retroactively effective to December 28, 1997, with a face value of $264,809. MetLife stated in part that it was making this change because neither Dr. DeAngelis nor the STEP plan trustee had received timely notice of either the lapse of the policy or multidistrict litigation involving MetLife's marketing practices; the trustee had directed MetLife to send all mail to the trustee in care of the STEP plan administrator. Before the formal change of ownership, Dr. DeAngelis understood that the policy technically had no value but that MetLife was going to change the policy to reduced paid-up status retroactively to 1997. As of December 28, 2004 and 2005, respectively, the Dr. DeAngelis policy had a death benefit of $349,286 and $360,559.21 and a net cash surrender value of $232,215.81 and $244,798.07.

### D. Ms. Quinn Policy

On January 3, 2003, Dr. DeAngelis formally terminated VRD/RTD's participation in STEP. At that time, Dr. DeAngelis offered on behalf of VRD/RTD to purchase from the STEP plan the DeAngelises survivor whole life policy, the Dr. Durante policy, and the Ms. Quinn policy. Dr. DeAngelis offered to purchase these policies at a cost of 10 percent of each policy's cash value, payable as a withdrawal from the policy's cash value.

On July 28, 2003, STEP assigned the ownership of the Ms. Quinn policy to Ms. Quinn. No severance event had occurred under the STEP plan to permit this assignment. In connection with the assignment, Ms. Quinn executed a claim settlement and release form, backdated to January 3, 2003, the day of VRD/RTD's formal termination of its participation in the STEP plan.

On August 7, 2003, STEP informed Ms. Quinn that it had asked MetLife to change the ownership of the Ms. Quinn policy from the STEP trustee to Ms. Quinn and that any action to reinstate the policy had to be made by Ms. Quinn. One day later, MetLife informed SPSI that it had received STEP's request to change the ownership of the Ms. Quinn policy but MetLife's records indicated that the policy had expired and was no longer in force. At the request of Dr. DeAngelis, the Ms. Quinn policy was changed by MetLife later in 2003 to reduced paid-up insurance retroactively effective to December 28, 1997, with a face value of $34,135. On September 30, 2003, MetLife confirmed to Ms. Quinn that she was the owner of the Ms. Quinn policy and that the policy was being continued as reduced paid-up insurance in the amount of $34,135, which would increase as dividends were credited to the policy.

On or after January 16, 2004, Ms. Quinn surrendered the Ms. Quinn policy to MetLife and received a check from MetLife in the amount of $15,573.69. MetLife processed the check on January 27, 2004. From December 28, 1993, through January 16, 2005, Ms. Quinn received life insurance coverage of $34,135 to $410,881 through the Ms. Quinn policy.

### XI. Survivor Whole Life Policies

### A. Domingos Survivor Whole Life Policy

*17 On December 10, 2001, STEP assigned the ownership of the Domingos survivor whole life policy to Dr. Domingo. As of December 28, 2001, the Domingos survivor whole life policy had a total death benefit of $596,009.81, less an

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                            Page 22
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

outstanding policy loan of $220,206.85, for a net death benefit of $375,802.96. As of the same date, the Domingos survivor whole life policy had a cash surrender value of $224,475.17, less the outstanding policy loan of $220,206.85, for a net cash surrender value of $4,268.32. As of November 2006, the Domingos survivor whole life policy had a cash value base of $277,316.37, a cash value of additional insurance of $21,380.58, an existing loan of $279,056.26, and loan interest due of $13,793.75, for a net cash surrender value of $5,846.94. From December 28, 1993, through the present, the Domingos received life insurance coverage of between $511,542 and $3,500,000 through the Domingos survivor whole life policy.

### B. *DeAngelises Survivor Whole Life Policy*

On July 28, 2003, STEP assigned the ownership of the DeAngelises survivor whole life policy to the DeAngelises. No severance event had occurred under the STEP plan to permit this assignment. In connection with the assignment, Dr. DeAngelis also executed a claim settlement and release form backdated to January 3, 2003.

As of various times, the policy's death benefit and net cash surrender value were as follows:

| As of | Death Benefit | Net Cash Surrender Value |
|-------|---------------|--------------------------|
| 3/1/1999 | $595,195.38 | $186,974.68 |
| 12/28/1999 | 4,663,784.34 | 220,495.10 |
| 12/28/2000 | 678,528.13 | 236,229.57 |
| 12/28/2001 | 688,464.08 | 253,038.08 |
| 2/5/2003 | 699,316.63 | 272,153.06 |
| 3/31/2003 | 669,547.00 | 274,537.72 |
| 12/28/2004 | 713,391.54 | 305,930.83 |

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                                   Page 23
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

| 12/28/2005 | 719,830.71 | 324,053.39 |
|---|---|---|

### XII. *Dr. Durante Policy*

As of March 1, 1999, the cash surrender value of the Dr. Durante policy was $52,982.52. As of December 31, 2001, the cash surrender value of the policy was $23,508.43. As of February 25, 2003, the cash surrender value of the Dr. Durante policy was $21,811.95. As of each of these dates, the death benefit payable under the policy was $1,864,269.

On July 28, 2003, STEP assigned the ownership of the Dr. Durante policy to Dr. Durante. No severance event had occurred under the STEP plan to permit this assignment. In connection with the assignment, Dr. Durante also executed a claim settlement and release form backdated to January 3, 2003.

On August 4, 2003, the cash surrender value of the Dr. Durante policy was $17,635.98, and the death benefit was $1,864,269. The Dr. Durante policy had no value once it expired on February 1, 2005. From December 28, 1993, through February 1, 2005, Dr. Durante received life insurance coverage of $1,804,135 to $1,864,269 through the Dr. Durante policy.

### XIII. *Acquisition of STEP*

STEP was acquired from Teplitzky & Co. in February 2002 by STEP Acquisition Group; Inc. Afterwards, SPSI offered participants three options. Option A was "To continue participation in the STEP Plan & Trust as the Plan is now and as it is amended from time to time."Option B was "To terminate our participation in the STEP Plan & Trust and to have 80% of the potential severance benefit paid out to each of

our employees over a 24 month period."Option C was "To terminate our participation in the STEP Plan and rollover 90% of the potential severance benefit to purchase new insurance policies to provide death benefit protection in the BENISTAR 419 Plan and Trust."The STEP plan does not provide for any of these options. On June 28, 2002, Dr. DeAngelis signed a STEP "Option Selection Form" stating that VRD/RTD had decided "To continue participation in the STEP Plan & Trust as the Plan is now and as it is amended from time to time."

### XIV. *Recordkeeping for the STEP Plan*

*18 STEP maintained its records of employer contributions; insurance policy premiums; potential severance benefits; policy values; termination, surrender, or withdrawal dates; forfeitures; severance payments; "frozen" potential severance benefits; and surrenders and withdrawals on an employee-by-employee basis within each employer group, further segregated by each of the eight insurance companies participating in the STEP plan. STEP maintained its books and records first by insurance company, second by employer group, and finally by each individual employee. Forms 5500-C/R, Return/Report of Employee Benefit Plan, filed by the STEP plan were generally broken down by insurance company, employer group, and employee. Forms W-2, Wage and Tax Statement, were issued to participants with separate employer identification numbers for each life insurance company.

Each insurance policy was essentially a separate account for the covered employee on whose life the policy was written. The account included all of the employer's contributions for that employee, was increased by all of the income earned as a result of those contributions, was reduced by all insurance company charges to provide the life insurance benefits for only

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                    Page 24
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

that employee, and was used as the base from which to calculate the purported severance benefits of that employee. A severance benefit that was paid out to an employee was typically not equal to what had been paid in by way of employer contributions. The employer contribution was invested by STEP, and the assets grew.

VRD/RTD's contributions were invested in the individual insurance policies of the participating doctors and Ms. Quinn. The contributions for each policy were accounted for separately. Dividends were credited to the policy, and insurance charges were taken out of each of the policies to pay for the cost of providing the covered employee with life insurance coverage. STEP applied a factor to the cash value of the life insurance policy on the covered employee's life in order to compute the benefit payable to the employee. The insurance policies (or the cash derived therefrom) were distributed to VRD/RTD's participating employees without regard to STEP's purported computation of the allowable amounts of severance benefits.

### XV. *Dr. Domingo's Receipt of Plan Benefits*

On April 3, 1997, Dr. Domingo wrote to Mr. Katz requesting a "legal opinionated [sic] letter" regarding his "intent to retire within the time period of 3 years" for "business reasons and for continuity of our surgical group."Dr. Domingo requested that any response be sent to him "Personal and Confidential." Mr. Katz relayed Dr. Domingo's letter to Mr. Pagano. On May 1, 1997, Mr. Pagano advised Dr. Domingo that he would receive full benefits under the STEP criteria of "good cause" and "genuine business purpose" if he resigned after being asked to retire. Mr. Pagano advised Dr. Domingo that he would not qualify for benefits if he agreed to work for VRD/RTD in a different capacity.

*19 On March 21, 2001, Dr. Domingo informed Teplitzky & Co. that on January 1, 1999, he "retired completely from my surgical practice" and wanted to know about the severance monetary benefits available to him. On March 28, 2001, Teplitzky & Co. informed Dr. Domingo that he needed to establish a severance event in order to qualify for benefits under the plan and had to establish to the satisfaction of the plan's independent fiduciary that the termination was for good cause within the meaning of New York State Unemployment Insurance Law. Teplitzky & Co. enclosed examples of "good cause" under New York law and advised Dr. Domingo to call Mr. Mamorsky if he had any questions.

On June 17, 2001, Dr. Domingo relayed to the STEP plan administrator his revised request for severance benefits, including a formal "Request for Benefit Payments" and an attached "Reason for Termination of Service". The revised claim removed all reference to his prior statement that he had "completely retired" from his surgical practice. The revised claim stated that on October 5, 1998, VRD/RTD asked him to terminate his association with the group effective January 1, 1999, because his financial contribution to the group was not satisfactory. Dr. Domingo claimed that his compensation for the last 12-month period before his termination of service was $323,334.

On July 16, 2001, VRD/RTD mailed to Teplitzky & Co. an "Employer Request for Payment of Benefits" for Dr. Domingo listing the date of severance as January 1, 1999, and stating that the compensation paid to Dr. Domingo for the last 12-month period before termination of employment was $323,334. Attached to the request was the same "Reason for Termination of Service" that Dr. Domingo had attached to his benefit request. Both forms were signed by Dr. DeAngelis on June 30, 2001. Before that request, neither VRD/RTD nor Dr. Domingo notified STEP that Dr. Domingo had stopped providing services to VRD/RTD on January 1, 1999.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                              Page 25
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

On August 10, 2001, Teplitzky & Co. forwarded Dr. Domingo's claim for severance benefits to Mr. Pagano, asking Mr. Pagano if he agreed or disagreed with the claim. On September 4, 2001, Mr. Pagano informed Teplitzky & Co. that he had reviewed Dr. Domingo's claim for severance benefits and that he confirmed that it was an "induced termination due to non renewal of contract" which would be a qualifying event for severance benefits under the STEP plan.

On September 20, 2001, Teplitzky & Co. notified Dr. Domingo that his severance benefit had been approved in the estimated amount of $233,661 and offered Dr. Domingo the opportunity to "purchase" the Domingos survivor whole life policy, coverage of which was $587,232, for $5,496. On September 25, 2001, Dr. Domingo wrote to Teplitzky & Co. asking for answers to certain questions he had about his benefits and his life insurance policies, including a question as to why he had to pay so much to purchase the Domingos survivor whole life policy. On September 28, 2001, Teplitzky & Co. responded to Dr. Domingo's questions, indicating, among other things, that the purchase price for his policy was determined by subtracting from the $217,305 cash surrender value of the policy the maximum loan that could be taken of $211,809, leaving a balance in the policy of $5,496. On October 9, 2001, Ms. McDermott confirmed in writing to Dr. Domingo that MetLife would be willing to change the policy on his life to reduced paid-up status retroactively effective to the date when a request to make such a change could have been timely made. Ms. McDermott also informed Dr. Domingo that the policy was still "technically an asset of the severance plan" so it would be a "good idea" to get the policy from the plan before the change was made. Ms. McDermott attached a letter showing that the policy is presently of "no value to the plan" to assist Dr. Domingo in getting the policy.

*20 On October 14, 2001, Dr. Domingo advised Teplitzky & Co. that he wished to purchase the Domingos survivor whole life policy. One day later, Dr. Domingo sent to Mellon Trust a $2,000 check from Rodolfo T. Domingo M.D.P.C. and a $3,496 check from the Domingo Family Limited Partnership as requested by the STEP plan administrator to purchase the Domingos survivor whole life policy. On October 24, 2001, Teplitzky & Co. applied for a policy loan on and requested a change in ownership of the Domingos survivor whole life policy. The policy loan was used to pay to Dr. Domingo his requested severance benefits totaling approximately $220,000.

XVI. *Dr. DeAngelis's Receipt of Plan Benefits*

Dr. DeAngelis filed a claim for severance benefits with STEP in November 2002. In connection therewith, Dr. DeAngelis on November 19, 2002, signed a "Request for Payment of Benefits" stating that he was terminating his services because of "prostate cancer, with symptoms which interfere with employee's ability to perform surgery" and that his compensation for the 12-month period before his termination of service was approximately $350,000. Dr. DeAngelis underwent radiation and incurred radiation colitis to try to treat his prostate cancer and continued to work until December 31, 2003.

Wayne Bursey (Mr. Bursey), the president of SPSI, approved the claim. Mr. Bursey was concerned about the possibility of future litigation between Dr. DeAngelis and STEP, insofar as Drs. DeAngelis and Domingo had threatened suit against the prior plan administrator but had never instituted any such litigation.

OPINION

I. *Overview*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                          Page 26
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

We are faced once again with an issue arising from a plan designed aggressively to bolster the sale of insurance products through a claim of permissible tax savings. Cf. *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir.2002). Respondent determined that neither the PCs' payments to VRD/RTD related to the STEP plan nor VRD/RTD's ensuing contributions to the STEP plan were deductible under section 162(a) as ordinary and necessary business expenses and that the amounts of the payments were includable in the doctors' gross income under section 61(a). Respondent argues that the payments were made for the doctors' personal benefit. Petitioners argue that the payments and contributions are deductible under section 1.162-10(a), Income Tax Regs., as "Amounts paid or accrued within the taxable year for dismissal wages" and, thus, that the payments are not includable in the doctors' gross income. We agree with respondent's determination on the disallowed deductions but disagree with respondent's determination on the inclusion in income. We set forth our analysis below primarily in two sections. The first section sets forth our opinion of the credibility of the witnesses. The second section sets forth our opinion on the substantive issues at hand.

II. *Credibility of the Witnesses*

A. *Expert Witnesses*

*21 At trial, each party called an expert witness in support of their and his respective positions. Petitioners called Michael L. Frank (Mr. Frank), and the Court recognized him as an expert on experience rating and risk sharing. Mr. Frank is an actuary who graduated from the University of Michigan in 1987 and has worked in the insurance industry ever since. He currently works for his own company in part (1) advising employers on the purchase of insurance, (2) consulting on employee benefits and the plans related thereto, (3) brokering and underwriting insurance, and (4) helping insurance and other companies

underwrite insurance. His credentials include that he is licensed to sell life and other forms of insurance in 18 States, that he is an associate of the Society of Actuaries, that he is a member of the American Academy of Actuaries, and that he is a fellow of the Conference of Consulting Actuaries. Petitioners retained him less than 3 months before trial to testify as an expert in this proceeding. Mr. Carpenter, with whom Mr. Frank has had a longstanding working and personal relationship, recommended him.

Respondent called Charles C. DeWeese (Mr. DeWeese) at trial to testify as an expert, and the Court recognized Mr. DeWeese as an expert on multiple-employer benefit plans, insurance experience rating, and individual life insurance policies. Mr. DeWeese is an independent consulting actuary who graduated from Yale University in 1968 and has worked in the insurance industry ever since. His credentials include that he has been a fellow of the Society of Actuaries since 1972, a member of the American Academy of Actuaries since 1974, and a fellow of the Conference of Consulting Actuaries since 1987. Various courts, including this one, have previously recognized Mr. DeWeese as an expert on subjects similar to those relevant herein, and he has repeatedly testified as an expert on those subjects, including twice in this Court. See *Neonatology Associates, P.A. v. Commissioner*, supra at 85-86; *Booth v. Commissioner*, 108 T.C. 524, 573 (1997).

The Court has broad discretion to evaluate the cogency of an expert's analysis. See *Neonatology Associates, P.A. v. Commissioner*, supra at 85.Sometimes, an expert will help us decide a case. See, e.g., *id.;Booth v. Commissioner*, supra at 573; *Trans City Life Ins. Co. v. Commissioner*, 106 T.C. 274, 302 (1996). Other times, he or she will not. See, e. g., *Estate of Scanlan v. Commissioner*, T.C. Memo.1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir.1997); *Mandelbaum v. Commissioner*, T.C. Memo.1995-255, affd. without published opinion 91 F.3d 124 (3d Cir.1996). Aided by our common sense and our perception of the expert during his or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

816

her testimony, we weigh the helpfulness and persuasiveness of an expert's testimony in the light of his or her qualifications and with due regard to all other credible evidence in the record. See *Neonatology Associates, P.A. v. Commissioner, supra* at 84-85. We may embrace or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion to adopt. See *Helvering v. Natl. Grocery Co.,* 304 U.S. 282, 294-295 (1938); *IT & S of Iowa, Inc. v. Commissioner,* 97 T.C. 496, 508 (1991). We are not bound by an expert's opinion and will reject an expert's opinion to the extent that it is contrary to the judgment we form on the basis of our understanding of the record as a whole. See *IT & S of Iowa, Inc. v. Commissioner, supra* at 508.

*22 In making our findings of fact and reaching our decisions herein, we have given little weight to the testimony of Mr. Frank. Although the Court recognized Mr. Frank as an expert on the stated subjects, we were and remain troubled that Mr. Frank has a longstanding and continuing working and personal relationship with Mr. Carpenter and other entities and persons with financial and/or other direct interests in the resolution of these cases. See *Neonatology Associates, P.A. v. Commissioner,* 115 T.C. at 86 (stating that "An expert witness loses his or her impartiality when he or she is too closely connected with one of the parties" and holding that such an expert is of limited value to the Court). In fact, during trial, we were forced to admonish Mr. Frank that he should not be improperly communicating with one or more of the just-referenced persons and petitioners' counsel. In addition to that stated relationship, we also on the basis of our observation of Mr. Frank's candor, sincerity, and demeanor perceived him to be of little help to the Court in deciding these cases. As to Mr. DeWeese, we have respected his testimony and given that testimony appropriate weight. When Mr. DeWeese previously testified before this Court, the Court on each occasion found him to be reliable, relevant, and helpful on the areas that were the subject of his expertise. See *id.* at 85-86; *Booth v. Commissioner, supra* at 573. We find him likewise helpful in these cases.

### B. *Fact Witnesses*

At trial, petitioners called five witnesses to testify as to the facts of these cases; respondent called three such witnesses. Petitioners' fact witnesses were Drs. DeAngelis and Domingo and Messrs. Mamorsky, Bursey, and Teplitzky. Respondent's fact witnesses were Dr. Borrero, Mr. Mamorsky, and Ms. McDermott.[FN19] On the basis of our perception of the witnesses and our review of the record as a whole, we do not find much of the testimony of the fact witnesses to be helpful as to the critical facts underlying the issues at hand. See generally *Neonatology Associates, P.A. v. Commissioner, supra* at 84 (discussing the standards that the Court applies to evaluate the testimony of trial witnesses). We rely mainly on the testimony of Mr. DeWeese and the voluminous record built by the parties through their comprehensive stipulation of facts and exhibits.

FN19. For completeness, we note that respondent also called Mr. Carpenter to testify at an evidentiary hearing held immediately before trial. Petitioners had moved the Court approximately 1 month before trial to issue an order generally disqualifying Mr. DeWeese from testifying as an expert witness in this proceeding and had attached to their motion an affidavit of Mr. Carpenter setting forth serious allegations questioning the objectivity of Mr. DeWeese. In respondent's response to that motion (as supplemented by petitioners to address in part a question by the Court as to why petitioners had not filed their motion earlier), respondent raised serious issues of truthfulness on the part of Mr. Carpenter and requested in part that the Court hold an evidentiary hearing so that respondent could question Mr. Carpenter as to his actions connected with this proceeding and the subject matter thereof. The Court granted respondent's request. The Court ultimately

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

denied petitioners' motion as supplemented.

III. *Substantive Issues at Hand*

A. *Disallowance of Deductions*

Section 162(a) generally provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". A taxpayer such as VRD/RTD or one of the PCs must meet five requirements in order to deduct an item under this section. The taxpayer must prove that the item claimed as a deductible business expense: (1) Was paid or incurred during the taxable year; (2) was for carrying on its trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense.[FN20]See *Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971)*; *Welch v. Helvering, 290 U.S. 111, 115 (1933)*; see also Rule 142(a)(1). A determination of whether an expenditure satisfies each of these requirements is a question of fact. See *Commissioner v. Heininger, 320 U.S. 467, 475 (1943)*.

FN20. While sec. 7491(a) places the burden of proof upon the Commissioner in certain cases, the Court has decided in an unpublished order that sec. 7491(a) has no applicability to these cases.

*23 Petitioners argue that section 162(a) allowed VRD/RTD and the PCs to deduct the amounts related to the STEP plan because those amounts represented "dismissal wages" paid to a "welfare or similar benefit plan" within the scope of section 1.162-10(a), Income Tax Regs. We disagree. While the STEP plan may have been cleverly designed to appear to be a welfare benefits fund and marketed as such, the facts of these cases establish that the plan was nothing more than a subterfuge through which the participating doctors, through VRD/RTD, used surplus cash of the PCs to purchase cash-laden whole life insurance policies primarily for the benefit of the participating doctors personally. While employers are not generally prohibited from funding term life insurance for their employees and deducting the premiums on that insurance as a business expense under section 162(a), employees are not allowed to disguise their investments in life insurance as deductible benefit-plan expenses when those investments accumulate cash value for the employees personally. See *Neonatology Associates, P.A. v. Commissioner, supra* at 88-89.

The insurance premiums at hand pertained to the participating doctors' personal investments in whole life insurance policies that primarily accumulated cash value for those doctors personally. VRD/RTD's contributions to the STEP plan were used to pay the initial year's cost of providing life insurance for each participating doctor and to create an investment fund for the insured within his whole life insurance policy (or policies in the cases of Drs. DeAngelis and Domingo). That fund, when enhanced with expected future dividends, was calculated to be sufficient to pay for the future years' costs of life insurance protection and to provide for cash values sufficient to allow for a distribution of cash to the insured doctor whenever he opted to claim that he was involuntarily terminated from his business. As to each investment fund (and as to each insurance policy in general), the insured doctor regarded that fund (and policy) as his own, as did the STEP plan trustee, the STEP plan administrator, and MetLife. Very little (if any) value in one participating doctor's fund was available to pay to another insured, and any distribution of cash from the STEP plan to a participating doctor was directly related to the cash value of his policy. In many instances, a participating doctor dealt with his own insurance agent in selecting and purchasing the policy on his life, received illustrations on an assortment of life insurance investments that could be made through the STEP plan, determined the amount of his investment in his life insurance policy, selected the form of the insurance policy to be issued for him (e.g., single whole life versus survivor whole life), and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                 Page 29
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

selected his policy's face amount. In the latter regard, we note our finding on the basis of the credible evidence in the record that Drs. DeAngelis and Domingo, when dealing with Mr. Rapp, MetLife, and the insurance policies in general, were not acting as agents of VRD/RTD but were acting in their individual capacities. We also note our finding that Dr. Durante was not acting as an agent of VRD/RTD with respect to his policy.

*24 The use of whole life insurance policies and the direct interactions between the participating doctors and the STEP plan representatives support our finding that the participating doctors in their individual capacities fully expected to get their promised benefits and that any receipt of those benefits was not considered by anyone connected with the life insurance transaction to rest on any unexpected or contingent event. Each whole life insurance policy upon its issuance was in and of itself a separate account of the insured doctor, and the insured (rather than the STEP plan) dictated and directed the funding and management of the account and bore most risks incidental to the account's performance. The STEP plan in essence and in operation was simply an aggregation of separate plans for the participating doctors and not, as petitioners claim, one single plan in which various employers participated. The cash value in a participating doctor's policy was both intended to be and actually returned to the insured doctor, net of reductions for the cost of current insurance coverage and other de minimis amounts that were payable for charges related to the policies or otherwise incidental to the participation in the STEP plan. In fact, upon learning that their policies had lost the value that they expected to receive, Drs. DeAngelis and Domingo pursued recovery of those losses both directly and aggressively with their insurance agent and with the STEP plan representatives and caused the policies written on their lives to be transferred to them (and the Ms. Quinn policy to be transferred to her) as they had expected from the start of their investment in the STEP plan. As to the DeAngelises survivor whole life policy and the Domingos survivor whole life policy, the retroactive reinstatement and conversion of those policies

to APL also rebuts petitioners' claim that each insurance policy was truly an asset of the STEP plan which the plan had the unfettered right to benefit from, to liquidate, or to dispose of; to the contrary, the cash value theoretically belonging to the STEP plan was converted into death benefits for Drs. DeAngelis and Domingo even though VRD/RTD had stopped making contributions years before the conversion.

We also note the events leading up to the initial purchase of the whole life insurance policies. Through the partnership agreement executed on June 19, 1990, Drs. DeAngelis and Domingo had expressed their intent to retire in the near future. Yet, in connection with the planning of their personal estates and their consideration of ways to reduce the application to their estates of the Federal estate tax, Dr. DeAngelis caused VRD/RTD to join the STEP plan on December 30, 1993. Drs. DeAngelis and Domingo were told that their 1993 and 1994 payments to the STEP plan would suffice to fund the future costs of providing life insurance benefits for the remainder of their lives and to provide future distributions of cash to them at the time of their choosing. From the beginning of their decision to participate in the STEP plan, the participating doctors were most concerned about the amounts of, and their ability to receive, their expected benefits from STEP. In fact, Drs. DeAngelis and Domingo requested calculations and illustrations showing how much they would receive depending upon the number of years that contributions were made to the STEP plan. Drs. DeAngelis and Domingo also wrote to Mr. Katz for assurance that they would receive their benefits and requested a written opinion from the plan sponsor about how to characterize their planned departures from their practices so as to meet the terms of the STEP plan as written. STEP advised the participating doctors on what to say in order to get their promised benefits, and STEP assured the doctors that a protocol was in place to ensure that they would get their money as intended. Because each of the participating doctors' PCs funded its own employee's benefits under the STEP plan, STEP was at no significant loss in allowing each PC to remove from the plan the money it invested therein.[FN31]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN21. We also are mindful that the provisions in the STEP plan were routinely not followed; e.g., Dr. Domingo received a "severance" benefit even though he informed the STEP plan administrator that he had "completely retired", a situation that even the author of the STEP plan admitted was not an eligible event under the STEP plan as written.

**\*25** Petitioners rely erroneously on *Booth v. Commissioner,* 108 T.C. 524 (1997), in arguing that these cases turn primarily not on the application of section 162(a) but on the question of whether the STEP plan meets the requirements of section 419A(f)(6). As discussed herein, our decisions in these cases turn on our factual evaluation of the relationship between the participating doctors and their whole life insurance policies without any regard to the STEP plan's qualification under section 419A(f)(6), and we decide on the basis of the credible evidence in the record before us that those doctors upon investing in the STEP plan had the primary right to receive the value reflected in the insurance policies written on their lives. We note in this regard that the Court in *Booth v. Commissioner, supra,* did not decide the issue under section 162(a) that we decide today.

In sum, we find that the PCs' payments to VRD/RTD were distributions to the doctors personally and that neither those payments nor VRD/RTD's ensuing contributions to STEP were ordinary and necessary business expenses under section 162(a) (except to the extent they relate to payments of premiums on the Ms. Quinn policy as discussed *supra* note 3). Accord *Neonatology Associates, P.A. v. Commissioner,* 115 T.C. 43 (2000). Consequently, we hold that those amounts are not deductible under section 162(a) by either the PCs or VRD/RTD. [FN22]

FN22. Although the PCs may arguably be entitled to deduct the costs of the current life insurance protection purchased through the STEP plan, see *Neonatology Associates, P.A. v. Commissioner,* 115 T.C. 43 (2000), petitioners have not requested any such deductions, and the record does not allow the Court to find the amounts of any such deductions.

**B. *Inclusion in Income***

Respondent determined that the amounts of the life insurance premiums that were paid by each doctor's PC on his behalf are includable in the doctor's gross income under section 61(a) as "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."See *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431 (1955). We disagree that those amounts are includable in the doctors' gross income. While the payments of the premiums were indeed accessions to the doctors' wealth, our decision on this issue does not rest simply on that finding. Instead, our decision turns on our finding that the doctors' PCs were S corporations and that the payment of the premiums by the PCs was essentially a distribution to the doctors of corporate profits rather than a payment that the PCs made to the doctors with a compensatory intent. See *Neonatology Associates, P.A. v. Commissioner, supra* at 91-92, 95-96; see also *Neonatology Associates, P.A. v. Commissioner,* 299 F.3d at 231-232. In accordance with the Federal income tax law applicable to S corporations, most particularly sections 1367 and 1368, our disallowance of the deductions claimed by the PCs has the effect of increasing pro tanto the net income of those PCs, with corresponding increases to the doctors' distributive shares of that income. That being so, the payments of the premiums are not taxed a second time to the doctors.[FN23] Cf. *Neonatology Associates, P.A. v. Commissioner,* 115 T.C. at 95-96 (tax at the shareholder-level was appropriate where the employer was a C corporation).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

T.C. Memo. 2007-360                                                                                          Page 31
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007
RIA TC Memo 2007-360
(Cite as: T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.))

FN23. In other words, we regard each distribution as a tax-free recovery of adjusted basis, taking into account the increase in basis resulting from the disallowance of deductions claimed by the PC.

---

\*26 We have considered each argument made by petitioners for holdings contrary to those expressed herein and have rejected all arguments not discussed herein as irrelevant or without merit. We also have considered each argument made by respondent for a holding contrary to that expressed herein as to the inclusion in income and have rejected all arguments not discussed herein as irrelevant or without merit. Accordingly,

*Decisions will be entered under Rule 155.*

U.S.Tax Ct.,2007.
V.R. Deangelis M.D.P.C. v. C.I.R.
T.C. Memo. 2007-360, 2007 WL 4257483 (U.S.Tax Ct.), 94 T.C.M. (CCH) 526, T.C.M. (RIA) 2007-360, 2007 RIA TC Memo 2007-360

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.